## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN VOE,

       Plaintiff,

              v.

JAMES N. MATTIS, in his official capacity as
Secretary of Defense; HEATHER A. WILSON,
in her official capacity as Secretary of the Air
Force; and the UNITED STATES
DEPARTMENT OF DEFENSE,

       Defendants.

Case No.: _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiff John Voe,[1] by and through his attorneys, brings this action for declaratory and injunctive relief stemming from his unconstitutional and improper medical discharge from the United States Air Force ("Air Force").  Voe was discharged only because he is living with the human immunodeficiency virus ("HIV"), despite repeatedly being found medically fit for duty since his diagnosis.

## STATEMENT OF THE CASE

2.      Members of the U.S. Armed Forces embody the best of the American spirit.  They sacrifice to serve and defend us for love of country and community.  In return, our nation has made sacred promises to provide medical care for them and to treat them with the respect and dignity they deserve.  Our military treats service members' wounds and illnesses and, when able, they

---

[1] Plaintiff's motion to proceed here under a pseudonym has been filed contemporaneously herewith.

continue to serve.  When military physicians determine that service members are unfit for duty and unable to continue serving, they are afforded a process to be medically separated or retired.

3.      Unfortunately, at least one type of illness has led certain officials in the military to surrender that promise.  Asymptomatic HIV has been diagnosed in a significant number of active duty service members.  Contrary to widespread misunderstandings about HIV, a new diagnosis does not have the same ramifications it did when HIV first entered the public consciousness.  For most people living with HIV, medication renders their HIV inconsequential to their daily lives. Those who adhere to these medications have no symptoms or significant effects on their immune systems and reach a suppressed viral load, making it impossible to transmit HIV.  With access to basic health care, those found medically fit for duty continue to contribute meaningfully to the military and to their country.

4.      Recognizing the important contributions of these service members, the Department of Defense ("DoD") has clear policies and regulations, dating back to 1988, to retain those who are diagnosed with HIV while on active duty.  According to DoD publications, from 2011 to 2016, the Air Force diagnosed 181 airmen with HIV; in 2017, 119 of those airmen—more than 65%— were still serving.  In 2011, the U.S. Army counted 480 soldiers with HIV serving on active duty, with some serving for more than 20 years after they were diagnosed.  Recognizing the contributions of service members living with HIV, the U.S. Navy now evaluates service members on a case-by-case basis for some overseas and operational assignments, including on ships, submarines, and aircraft carriers.  And, as of late 2017, the Air Force has allowed at least 13 airmen living with HIV to serve overseas and support vital missions.  Indisputably, these service members are fit for duty, have needed skills to contribute, and are able to manage their HIV without it affecting their duties.

5.      Sadly, not all decision makers in the military have caught up to modern science. This case highlights one such example, in which certain Air Force personnel ignored the recommendations of their own medical officers and operational commanders when they wrongly separated a cadet who was deemed medically fit to serve.

6.      Plaintiff John Voe enlisted in the Air Force in 2009.  He dreamed of being an officer, and after much hard work, dedication, and serving with distinction for years, he secured a coveted appointment to the U.S. Air Force Academy ("USAFA") in 2012.

7.      While on active duty after enrolling at the USAFA, Voe was diagnosed with HIV during a routine military medical examination mid-way through his second year.  Though the diagnosis at first seemed a setback, Voe reaffirmed his commitment to country and to service.  He learned that the condition was manageable and it would not interfere with his duties or his ability to serve as an officer.

8.      In accordance with military regulations and procedures, Voe was evaluated by military medical professionals to determine whether he was medically fit to serve.  He was found fit for duty and received a waiver as to his HIV diagnosis to return to duty and to continue his education at the USAFA.  Over time, he would be re-evaluated twice more for routine follow-ups, each time being found medically fit for duty.

9.      Air Force officials understood that Voe would have been able to continue to serve if he had been diagnosed with HIV as either (i) an enlisted member who wanted to remain enlisted; or (ii) a commissioned officer.  But because Voe was enrolled in the USAFA as a cadet when he received his HIV diagnosis, Voe was denied his commission upon graduation and kicked out of the military altogether without being afforded the discharge evaluation procedures required by the DoD.

10.     The Air Force's actions were not just contrary to military regulations relating to the treatment of active duty service members with HIV.  To the extent the Air Force followed any outdated policies pertaining to HIV, its actions violate the Administrative Procedures Act and were unconstitutional.  Specifically, policies and practices implemented by the DoD and Air Force that single out and treat Voe—and others like him living with HIV—differently from other service members are arbitrary, capricious, contrary to law, an abuse of discretion, and a violation of Voe's right of equal protection.

11.     At best, Air Force policies singling out service members living with HIV for starkly different treatment are an unfortunate vestige of a time when HIV was untreatable and invariably fatal—an anachronism whose justifications no longer comport with modern medical science. Whether these policies reflected animus at the time they originally were created or not, they now constitute outright discrimination.  When faced with other conditions or illnesses, each service member is given due consideration based on his or her circumstances and condition.  By contrast, when Voe attempted to commission as an officer while living with HIV, he faced an ill-informed, categorical bar banning him from continuing his service.

12.     The Air Force and the DoD have neglected their duty to take care of their own.  The justifications used to discharge a medically fit service member such as Voe—and to treat him unequally solely because he is living with HIV—are neither supported by law or evidence.  By establishing the illegality of Defendants' conduct and reinstating Voe's commission as an officer, this case seeks to correct that injustice and to prevent others from enduring the same mistreatment.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 2201–02.  This case poses federal questions that arise primarily from the U.S.

Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; and other federal statutes, including 10 U.S.C. §§ 101, 1203, 1217, and 8075.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1).   A substantial part of the events and omissions giving rise to these claims occurred in this District. Additionally, the named Defendants are officers of the United States who conduct a significant amount of their official duties in this District.

## THE PARTIES

### A.  Plaintiff

15.    Plaintiff Voe is an honorably discharged veteran who served on active duty in the Air Force—first as an enlisted service member and later as a cadet at the USAFA, graduating in June 2016.

16.    Voe proceeds under a pseudonym not only for reasons of medical privacy but also because of the stigma, discrimination, and common misunderstandings associated with HIV.

### B.  Defendants

17.    Defendant James N. Mattis is the Secretary of the Department of Defense.  He leads the DoD and is responsible for the administration and enforcement of the challenged policies and practices.

18.    Defendant Heather A. Wilson is the Secretary of the U.S. Air Force.  She is the leader of the Department of the Air Force and responsible for its regulations and the actions taken against Voe.

19.    The Department of Defense is a department within the executive branch of the U.S. government responsible for coordinating and supervising all agencies and functions of the government concerned directly with the U.S. Armed Forces.   Under the direction of Secretary

Mattis, DoD is also responsible for administration and enforcement of the challenged policies and regulations.

20.     All Defendants are sued in their official capacities and each count below is alleged against all Defendants.

## BACKGROUND

### A.  Statutory and Regulatory Background

21.     In addition to the Code of Federal Regulations ("C.F.R."), two sets of regulations are relevant to active duty service members, including cadets, who are diagnosed with HIV: Department of Defense instructions ("DoDIs") and Air Force instructions ("AFIs").[2]  Excerpts of these regulations in effect at the time of the events described herein are appended to this Complaint:

- Exhibit A:  DoDI 6130.03, Medical Standards for Appointment, Enlistment, or Induction in the Military Services (Apr. 28, 2010) (the "Medical Entry Standards DoDI")

- Exhibit B:  AFI 48-123, Medical Examinations and Standards (Nov. 5, 2013) (the "Medical Standards AFI")

- Exhibit C:  AFI 36-3504, Disenrollment of United States Air Force Academy Cadets (July 9, 2013) (the "Disenrollment AFI")

- Exhibit D:  DoDI 6485.01, Human Immunodeficiency Virus (HIV) in Military Service Members (June 7, 2013) (the "HIV DoDI")

- Exhibit E:  AFI 44-178, Human Immunodeficiency Virus Program (Mar. 4, 2014, certified current June 28, 2016) (the "HIV AFI")

---

[2]  Current DoDIs and other DoD regulations and policies may be viewed at http://www.esd.whs.mil/DD/.  Current AFIs and similar regulations or policies may be viewed at http://www.e-publishing.af.mil/.

**B.  Treatment of HIV**

22.     The landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified in the 1980s.

23.     In 1996, the advent of new antiretroviral medications to prevent the virus from replicating transformed the landscape of HIV treatment and prevention and radically shifted health outcomes for people living with HIV.

24.     The effectiveness of these antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood, which is referred to as the "viral load."  While a person in the acute or secondary stage of infection could have a viral load of one million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48-50, which is referred to as an "undetectable" viral load.

25.     With adherence to these medications, people living with HIV are restored to good health.  Patients with an AIDS diagnosis were literally brought back from the brink of death through antiretroviral combination therapy.  Over time, researchers and clinicians were able to refine the use of these medications to make treatment adherence easier and health outcomes even better.  Though the side effects of the initial antiretroviral drugs were generally tolerable, researchers developed new medications that had few or no discernible side effects for most people. The standard of care shifted to starting treatment with antiretroviral drugs almost immediately after diagnosis—a recognition that the benefits of treatment far outweighed any negative consequences of being on these medications.

26.     Today, though still incurable, HIV is a chronic, manageable condition rather than the terminal diagnosis it once was.  In fact, a 25-year-old diagnosed in a timely fashion and provided appropriate treatment has very near the same life expectancy as a 25-year-old who does not have HIV.

27.     Furthermore, medical researchers have now established that a person with a suppressed viral load is incapable of transmitting HIV.  Contrary to popular belief, even without viral suppression, HIV is not easily transmitted.  The Centers for Disease Control and Prevention ("CDC") estimates that, in the absence of treatment or other preventive measures, such as condom use, the risk of HIV transmission through a single act of receptive anal sex—the riskiest sexual activity—is approximately 1.38%.[3]  The per-act risk of transmission for other sexual activities is between zero and .08%.  However, *with adherence to HIV medications and the resulting viral suppression, the risk of transmission is essentially zero for any sexual activity.*[4]  Antiretroviral treatment therefore not only dramatically improves personal health outcomes, but also improves public health outcomes by reducing transmission and the number of new cases.

28.     Transmission of HIV is extremely rare outside of the context of sexual activity, sharing of injection drug equipment, blood transfusion, needle sticks, or perinatal exposure (including breastfeeding).  For all other activities—including biting, spitting, and throwing of body fluids—the CDC characterizes the risk as "negligible" and further states that "HIV transmission

---

[3] *See* Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risks/estimates/riskbehaviors.html (last updated Dec. 4, 2015).

[4] *See* Centers for Disease Control and Prevention, *Treatment as Prevention*, www.cdc.gov/hiv/risk/art/ (last updated May 7, 2018).

through these exposure routes is technically possible but unlikely and not well documented."[5]  The theoretical possibility of HIV transmission in these other contexts is eliminated entirely by adherence to medications and the viral suppression that results.

29.     Despite the tremendous breakthroughs in the treatment and prevention of HIV, people living with HIV continue to be subjected to stigma, ostracization, and discrimination rooted in misconceptions, fear, and ignorance that is deeply rooted in the psyche of the American public.

**C.  Voe's Discharge from the Air Force**

30.     On January 13, 2009, Voe enlisted in the Air Force for a term of six years.  He subsequently earned the position of Space System Operations Journeyman.

31.     On July 13, 2011, Voe was promoted to the grade of E-4, Senior Airman, the grade he retained until his honorable discharge.

32.     From June 28, 2012, to January 12, 2015, Voe was a member of the Air Force in enlisted status and on active duty while a cadet at the USAFA.  (*See* 10 U.S.C. § 516.)  U.S. service academy cadets are service members on active duty.  *See, e.g.*, 10 U.S.C. § 101(d)(1) ("The term 'active duty' . . . includes . . . attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned.").

33.     On February 28, 2014, while at the USAFA, Voe was diagnosed with HIV after a routine physical examination.  A military medical evaluation board ("MEB") was subsequently convened to assess Voe's medical qualification for continued service, in accordance with the Disenrollment AFI (Ex. C).

---

[5] Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risks/estimates/riskbehaviors.html (last updated Dec. 4, 2015).

34.     On June 2, 2014, the MEB issued a Return to Duty determination, allowing then-cadet Voe to continue to serve in the military.

35.     On June 9, 2014, Voe's immediate commanding officer held a meeting with other USAFA staff members to determine the "way ahead" for Voe, presenting a PowerPoint deck entitled the "way ahead" and noting divergent standards for *accession* of individuals living with HIV into the military and *retention* of individuals living with HIV already in the military. Accession standards precluded individuals living with HIV from appointment, enlistment, or induction into the military, whereas retention standards permitted enlisted and commissioned officers diagnosed with HIV on active duty to remain if found medically fit. *See* Medical Entry Standards DoDI, Ex. A ¶ 4(a)–(c), at p. 2, Encl. 4 ¶ 1, at p. 10, Encl. 4 ¶ 24(b), at p. 38; HIV DoDI, Ex. D Encl. 3 ¶ 2(c), at p. 7; HIV AFI, Ex. E, Attach. 9 ¶ A9.1, at p. 36.

36.     USAFA staff officers were confused about the applicable standard because, as stated in the PowerPoint, "there was no verbiage specific to prior-enlisted cadets," which Voe was.

37.     On November 3, 2015, Voe received a medical waiver for HIV from Lt. Gen. Michelle D. Johnson, the superintendent of the USAFA, to continue his service at the USAFA.

38.     In or around August 2014, during the beginning of his third year at the USAFA, Voe was offered and took a "commitment oath," vowing to serve for two additional years at USAFA and five thereafter as an officer.  USAFA officials told Voe that he was eligible to take the oath, and they did not inform him of any possibility that he might not be allowed to commission.

39.     Voe participated in the same commitment ceremony as all of the other cadets in his class.  He also received the same commitment packet, including a letter from the Commander-in-Chief.

40.     On January 13, 2015, Voe completed his term of enlistment.  Having received a medical waiver and been found medically fit for duty, Voe did not re-enlist, as he was led to believe by officials in the Air Force that he would be able to commission upon graduation from the USAFA.

41.     On July 28, 2015, Voe received his second of three return-to-duty authorizations, indicating that he was medically fit to serve.

42.     During the fall semester of 2015, certain USAFA officials were led to believe by Air Force officials that Voe would have to be disenrolled in accordance with the HIV AFI (Ex. E). Believing Voe should be permitted to commission, because Voe was (and is) medically fit to perform all of his duties as an officer, USAFA officials began the process of requesting an exception to policy ("ETP") to the HIV DoDI (Ex. D) (which was implemented by the HIV AFI) from the author of that instruction, the Undersecretary of Defense for Personnel and Readiness ("USD/P&R").

43.     On September 9, 2015, the director of the Air Force's Medical Evaluation Unit at San Antonio Military Medical Center ("SAMMC") wrote a letter recommending that, in his professional medical opinion, Voe was fit for duty and should be commissioned.

44.     On October 1, 2015, the staff Judge Advocate of the USAFA wrote an email expressing doubt that the ETP path was the proper procedure, and instead expressed support for a medical waiver by the USAFA chief medical officer (the "Surgeon General") or delegated authority.

45.     In an October 5, 2015 email to the USAFA staff Judge Advocate, the Surgeon General stated that he would grant Voe a medical waiver for HIV.

46.     When an ETP application was submitted instead, the Surgeon General maintained his support for Voe to commission in another October 5, 2015 email.

47.     Every single officer in Voe's chain of command, from Major to three-star General, including all medical officers responsible for Voe's evaluation and treatment, recommended that Voe be retained and commissioned.

48.     In December 2015, a staff summary sheet ("SSS") ETP complete with endorsements, letters, and recommendations was prepared for routing to the USD/P&R as the sole authority to grant an ETP.  Every senior officer at the USAFA, including the commanding three-star Superintendent, endorsed the ETP package.  Voe viewed the package before submission.

49.     On April 12, 2016, the Department of the Air Force issued orders assigning Voe to be a Second Lieutenant and contracting officer at Joint Base Andrews in Maryland, reporting no later than August 6, 2016.

50.     Voe graduated from the Air Force Academy on June 2, 2016, with a Bachelor of Science degree.

51.     Voe received a certificate of commissioning, a DoD Form 1AF, signed by the Secretary of the Air Force, stating he had been commissioned as a Second Lieutenant in the Regular component of the United States Air Force on June 2, 2016.

52.     On or about June 2, 2016, Voe took the same oath of office, required by federal statute, that other cadets took to become officers.

53.     On information and belief, Voe was included on a list of persons appointed to the rank of Second Lieutenant, signed by the Secretary of Defense.

54.     Notwithstanding other subsequent Air Force administrative requirements that are not prerequisites to holding office, on information and belief, Voe commissioned in the U.S. Air Force as a Second Lieutenant on June 2, 2016.

55.     After graduation, however, the Air Force did not recognize Voe as a commissioned Second Lieutenant and held him in cadet status while the ETP was being processed.

56.     Voe made numerous inquiries to his commanding officer as to his status and the progress of the ETP.  He was not provided with any information responsive to those inquiries.

57.     On or about July 22, 2016, Voe was informed through his commanding officer that the ETP package was subject to a delay "caused by a rewrite to the request per staff."  Voe was not informed as to the substance of the rewrite, which sections of the ETP were altered, or whether it was rerouted.  The commanding officer informed Voe "it was all done by the Air Staff liaison at the Pentagon."

58.     On September 14, 2016, while waiting for a determination on the ETP, Voe received his third return-to-duty waiver from military physicians deeming him medically fit to serve.

59.     On or about September 21, 2016, Voe met with the USAFA Commander's director of staff, who notified Voe that the Air Force Chief of Staff and Vice Chief of Staff were reviewing the ETP package and would discuss it during an upcoming leadership conference.

60.     Neither the Air Force Chief of Staff nor the Vice Chief of Staff were on the original routing sheet for the ETP, nor did they hold any medical expertise or general waiver authority according to applicable regulations.

61.     On October 5, 2016, a colonel at USAFA informally notified Voe that the Chief of Staff of the Air Force was recommending that he not be commissioned as an officer.

62.     Voe was not informed of the basis or any justification for the Air Force Chief of Staff's action, nor under what authority he was acting.

63.     Upon information and belief, the ETP package had been re-routed to either the Chief of Staff of the Air Force or the Secretary of the Air Force, rather than properly sent to the USD/P&R for approval or denial.

64.     On October 13, 2016, Voe was informed by the USAFA's staff Judge Advocate and other officers from the USAFA that the Secretary of the Air Force denied the ETP request.

65.     On October 26, 2016, Deputy Assistant Secretary of the Air Force for Force Management Integration, Jeffrey R. Mayo, wrote a letter to the USAFA commander stating that the Secretary of the Air Force disapproved of Voe's ETP request on September 28, 2016, and approved of taking action to separate and discharge him.

66.     On November 1, 2016, Voe was summarily discharged from the Air Force.

67.     Voe's Certificate of Discharge ("DD-214") characterizes the discharge as honorable and offers "Secretarial Authority" as the narrative reason for separation.  AFI 36-3504 (Ex. C, the Disenrollment AFI) is listed as the authority for Voe's separation on his DD-214.

68.     If properly assessed under the Disenrollment AFI, Voe met the standards for continued service and commissioning by virtue of either a return-to-duty determination or the granting of a waiver by the chief medical officer of USAFA, the Surgeon General, as directed by that regulation and the Medical Standards AFI (Ex. B).

69.     Voe's DD-214 also originally listed him as a commissioned Second Lieutenant.  An administrative correction subsequently was issued to amend his rank to "AF Cadet."

70.     Voe's DD-214 now indicates that he did not become an officer and was removed from the Air Force Academy shortly after graduation.  The only two logical conclusions to be

14

drawn from Voe's DD-214 are either that the Air Force found Voe unfit to serve or that some other

unusual circumstance or problem required his separation from service.

71.     The basis for Voe's discharge was that he was not medically fit for duty.  However,

a discharge based on medical unfitness must be processed through the disability evaluation system

("DES").  (Ex. B, Medical Standards AFI ¶ 5.2, at p. 24.)  When Voe was discharged, he did not

undergo any such processing, despite acquiring HIV while on active duty.

***

72.     Despite seemingly complex regulations, this case is simple: Military medical

professionals, who have the requisite knowledge, expertise, and judgment, should determine

whether a person is medically fit to serve.   And no predetermined biases or stigma-based

categorical bans should interfere.  The Constitution, military regulations, and equitable principles

demand nothing less.

73.     Moreover, Voe passed medical evaluations and was found fit for duty three times

after testing positive for HIV.  According to DoD and Air Force regulations, Voe should have been

and/or was: (a) granted a medical waiver and retained as an officer; or (b) retained after being

processed through the DES and returned to duty as an officer (and categorized in the "retention"

standard for all applicable regulations); and/or (c) retained because the sole person with the

authority to grant him a waiver—the chief medical officer of the USAFA—indicated he would

grant a waiver and advocated that Voe be commissioned as an officer.

74.     If it is determined that Air Force and DoD officials followed proper procedures and

did not act in an arbitrary or capricious manner in denying Voe his commission, the regulations to

which Voe was subjected are otherwise contrary to law and a violation of equal protection.  They

should be invalidated.   Under retention standards (including those already issued in the HIV

15

DoDI), setting criteria for HIV similar to those for other chronic, manageable conditions, Voe would be commissioned as an officer.

## CLAIMS FOR RELIEF

### COUNT  I

**Violation of the Administrative Procedure Act (APA)
as to Plaintiff's Discharge**

75.     All prior paragraphs are incorporated as if fully set forth herein.

76.     The Air Force failed to abide by its own regulations and governing statutes in the process of summarily discharging Plaintiff.

77.     If the procedures set forth in the regulation cited as the separation authority for Plaintiff, AFI 36-3504, had been followed, Plaintiff would have been retained and commissioned, as discussed above.

78.     Title 32, part 66 of the Code of Federal Regulations and the Medical Entry Standards DoDI (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3, at p. 7) granted medical waiver authority to the service secretary, who by the Medical Standards AFI delegated that authority to the chief medical officer of the U.S. Air Force Academy (Ex. B, AFI 48-123, Attach. 2, at p. 78), who stated he would grant a waiver to Voe to continue at the Academy and to serve as an officer.  The service secretary provided no explanation or rationale for why the appropriate regulations were not followed.  Plaintiff should have been retained and commissioned under these regulations.

79.     If the retention standards for active duty members had been applied to Plaintiff, he would have been retained in the military, according to either the Medical Entry Standards DoDI (Ex. A), the HIV DoDI (Ex. D), or the HIV AFI (Ex. E).

80.     If the accession standards had been applied to Plaintiff, he would have been retained and allowed to serve as an officer, because he was granted a waiver by the Surgeon General and/or as part of an MEB process and was found fit for duty.

81.     Voe's completed ETP was not properly routed to the USD/P&R as the sole authority to grant an ETP pursuant to the relevant regulations, but rather was improperly intercepted by the Air Force Chief of Staff, leading to his discharge.

82.     Pursuant to the Medical Standards AFI, a cadet found medically unfit for duty must go through DES processing in accordance with federal statute and regulations.  (Ex. B, AFI 48-123 ¶ 5.2.1.1, at p. 24).  In accordance with the Disenrollment AFI, the only path to discharge a cadet with medical issues is to conduct a DES, which consists of a MEB process and, if found unfit there, a referral to a Physical Evaluation Board ("PEB") to determine final fitness, disability, or separation.  (Ex. C, AFI 36-3504 ¶ 8, at p. 5).  The Air Force denied Plaintiff the proper DES process.

83.     Through the actions and omissions above, Defendants violated the APA.

**COUNT  II**

**Violation of the Administrative Procedure Act (APA)
as to AFI 44-178**

84.     All prior paragraphs are incorporated as if fully set forth herein.

85.     Plaintiff has no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

86.     The parts of the HIV AFI (Ex. E) that direct active duty cadets and officer candidates to be summarily disenrolled or not afforded a disability evaluation process are proscribed by the APA and should be declared unlawful because they are arbitrary, capricious, not in accordance with law, and an abuse of discretion.

87.     The parts of the HIV AFI that categorically bar USAFA cadets or other officer candidates with HIV from being commissioned as officers are arbitrary, capricious, not in accordance with law, and an abuse of discretion.

88.     The HIV AFI is based on outdated thinking that does not comport with the current state of HIV medical science.

89.     The parts of the HIV AFI that categorically bar USAFA cadets or other officer candidates with HIV from participating in a commissioning program or from being commissioned as officers conflict with several federal statutes and with other DoD and Air Force regulations, including:

(a)     Attachment 9 of AFI 44-178 (Human Immunodeficiency Virus Program), which directs retention for active duty service members living with HIV (Ex. E, AFI 44-178, Attach. 9 ¶ A9.1 at p. 36);

(b)     10 U.S.C. § 101(d)(1), 10 U.S.C. § 8075, and cases such as *Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017), and *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017), which hold that academy cadets are active duty service members;

(c)     DoDI 6485.01 (Human Immunodeficiency Virus (HIV) in Military Service Members), which states that active duty members are to be retained if they clear medical evaluations (Ex. D, DoDI 6485.01, Encl. 3 ¶ 2(c), at p. 7);

(d)     10 U.S.C. ch. 61 (Retirement or Separation for Physical Disability), which states that medical separation and DES processing applies to service academy cadets and outlines the process for medical separations;

(e)      DoDI 1332.18 (Physical Disability Evaluation), which is the DoD regulation referenced in DoDI 6485.01 and necessarily contemplates waiver, and which implements chapter 61 of title 10 for the Department of Defense;

(f)      AFI 36-3212 (Physical Evaluation for Retention, Retirement, and Separation), which implements the DES process from federal statute and the parent DoDI 1332.18;

(g)      32 C.F.R. pt. 66 (Qualification Standards for Enlistment, Appointment, and Induction), which states that the service secretary is the waiver authority for a medical standard;

(h)      DoDI 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), which states that the service secretary is the waiver authority for a medical standard (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3(b), at p. 7);

(i)      AFI 48-123 (Medical Examinations and Standards), which delegates waiver authority from the Secretary of the Air Force to the USAFA chief medical officer (USAFA/SG), and states that if a cadet receives a waiver from the accession medical standards, the retention medical standards apply (Ex. B, AFI 48-123, Attach. 2, Table A.2.1, at pp. 77–78; Ex. B, AFI 48-123 ¶ 5.2.1.1, at p. 24); and

(j)      AFI 36-3504 (Disenrollment of United States Air Force Academy Cadets), which states that AFI 48-123 controls the fitness for duty or medical discharge of USAFA cadets (Ex. C, AFI 36-3504 ¶ 8, at p. 5).

90.      The likely origin of the inconsistency presented by parts of the HIV AFI that categorically bar USAFA cadets or other officer candidates with HIV from being commissioned can be traced to the Air Force's failure to update the HIV AFI at the same time the DoD replaced

its corresponding HIV DoDI regulation in 2006.  As a result, Attachment 2 provides an outdated and inconsistent section of the HIV AFI that was not properly updated, fails to comply with statutes directing a disability evaluation for all cadets who incur a disabling condition in the line of duty, and is inconsistent with subsequent regulations.

91.    For the reasons above, certain parts of the HIV AFI are arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to the APA.

92.    Through the actions and omissions above, Defendants violated the APA.

### COUNT  III

### Violation of the Administrative Procedure Act (APA)
### as to DoDI 6485.01

93.    All prior paragraphs are incorporated as if fully set forth herein.

94.    Plaintiff has no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

95.    Applying the HIV DoDI (Ex. D) to bar service academy cadets or other officer candidates with HIV from participating in a commissioning program or from being commissioned as officers is arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to the APA.

96.    Applying the HIV DoDI to prevent the secretary of each armed service or their designees to determine waiverability of the medical standards she has set for fitness to serve is contrary to regulation and statute, and otherwise arbitrary and capricious and an abuse of discretion, all contrary to the APA.

97.    The original publication of the DoD regulation prohibiting people with HIV from joining the service in any capacity, and prohibiting service members with HIV from becoming officers, did not establish that the DoD had examined the relevant data and did not articulate a

rational connection between the facts and the policy choices made.  As such, that DoDI and any subsequent continuation of those prohibitions in the Code of Federal Regulations, in DoD directives, instructions, or other regulations, or in service-specific directives, instructions, or regulations, is arbitrary, capricious, not in accordance of law, an abuse of discretion, and violative of the APA.

98.    The HIV DoDI was required to have been both published in the Federal Register and put through notice and comment.  It was not.  Accordingly, the Court should vacate the regulation based on the procedural violation.

99.    Additionally, or alternatively, because the HIV DoDI was a substantive or legislative rule, this Court should vacate it as unlawful based on either a procedural violation of the APA or a procedural violation of the DoD's own regulations.

100.    If the DoDI is considered interpretative, the policy on excluding service members or civilians with HIV from becoming officers is arbitrary and capricious, not in accordance with law, and contrary to the APA.

101.    Through the actions and omissions above, Defendants violated the APA.

### COUNT  IV

### Violation of Procedural Due Process Under the Fifth Amendment

102.    All prior paragraphs are incorporated as if fully set forth herein.

103.    Plaintiff was discharged purportedly because he was medically unfit for duty due to a medical condition (HIV) he acquired while on active duty.  While Plaintiff does not agree that he was medically unfit, the Air Force's discharge entitled Plaintiff to a DES process in accordance with Air Force and DoD regulations and chapter 61 of title 10 of the U.S. Code.  Plaintiff has a property right in the benefits to which he is entitled as a service member who acquired, while on active duty, a condition the military deemed disabling.

104.     The actions taken by the Air Force and DoD placed a stigma or purported disability on Plaintiff that led to a change in Plaintiff's status and foreclosed his freedom to take advantage of employment opportunities and by broadly precluding him from continuing in his chosen career. Moreover, Defendants' actions are more likely to result in the forced disclosure of Plaintiff's HIV status in order to explain the discharge on his record.  As a result, the Defendants deprived Plaintiff of a liberty interest.

105.     Plaintiff was not afforded the process due, such as processing through the DES.  He was not given the opportunity to dispute to the proper authority through evidence, testimony, and a hearing that he was—and is—medically fit for service and fit for service as an officer.

106.     Plaintiff had, in fact, been determined by the relevant medical authorities to be medically fit for duty as an officer when the Air Force and DoD precluded him from serving further on the false basis that he was not medically fit for service as an officer.  That false determination caused Plaintiff's inability to continue his service as an officer and directly caused his discharge.

107.     The assumption that Plaintiff was not medically fit for duty was not only spread through official action internally but was also the underlying reason for discharge.  If a prospective external employer were to ask why Plaintiff was abruptly discharged from the Air Force shortly after graduating from the Academy, an unusual and therefore suspicious occurrence, Plaintiff would be compelled to answer truthfully.  The defamatory rationale for his separation affected Plaintiff's reputation and is affecting his employment prospects, depriving him of a liberty interest.

108.     If valid (which Plaintiff disputes), the regulations or policies of the Air Force and the DoD that prohibit enlisted persons such as Plaintiff from pursuing their chosen careers as officers based solely on their HIV status, place upon them a false stigma that similarly deprives them of a liberty interest.  Instead of being afforded a medical evaluation and the process necessary

to determine whether they are medically fit for duty, they are automatically and arbitrarily categorized as medically unfit and excluded from a range of employment opportunities as officers, despite hundreds of others with the same condition being allowed to continue to serve as officers in a multitude of positions.

109.    Through the actions and omissions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

## COUNT V

### Equitable Estoppel

110.    All prior paragraphs are incorporated as if fully set forth herein.

111.    Through its conduct and statements, Defendants made a definite representation to Plaintiff that he was medically fit for duty as a cadet and to commission as an officer.

112.    In reasonable reliance on the military's continued representations and assertions, Plaintiff took an oath and committed to further service at risk of substantial financial penalty—to wit, repayment of approximately $400,000 in education expenses—if he did not commission.  He also made the decision to forgo other opportunities to find other forms of employment in reliance on these assertions.  He also decided not to re-enlist.

113.    Plaintiff was not informed of any medical-based jeopardy to his ability to commission until well after he took a commitment oath and began his third year at the Academy, despite the military officials' knowledge that his HIV status would jeopardize his ability to commission.

114.    After military doctors found Plaintiff fit for duty, as well as fit to serve as an officer, and decided to give him a medical waiver to allow him to commission, the Air Force ultimately discharged Plaintiff on the basis that he was not medically fit.

115.     Defendants therefore engaged in affirmative misconduct, because they behaved in ways that caused an egregiously unfair result, and Voe reasonably relied on such conduct to his detriment.

116.     Accordingly, based on equitable principles, Defendants should be estopped from basing Plaintiff's disenrollment and discharge on the assertion that he was not medically fit.

117.     Plaintiff is entitled to a declaration that Defendants are estopped from discharging him based on his HIV status.

## COUNT VI

## Declaratory Judgment

118.     All prior paragraphs are incorporated as if fully set forth herein.

119.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

120.     Despite subsequent actions taken by military officials indicating the contrary, Plaintiff commissioned as an officer in the Air Force upon graduation from the USAFA on June 2, 2016.

121.     The Department of Defense or the Air Force does not have authority to revoke or not recognize a completed commission.

122.     Plaintiff is entitled to a declaratory judgment that he commissioned as an officer in the Air Force.

## COUNT VII

### Violation of Equal Protection Under the Fifth Amendment's Due Process Clause
### (Based on HIV Status)

123.    The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials, or its employees.

124.    Defendants' accession policies discriminate impermissibly against people living with HIV both on their face and as-applied by barring people living with HIV from enlistment in the military and appointment as officers in the military based solely on their HIV status.

125.    Defendants routinely permit similarly situated individuals who are not HIV-positive, including but not limited to people with comparable chronic, manageable conditions, to enlist in the military and to commission as officers, including for positions such as a contracting officer in the Air Force.

126.    Defendants have refused to grant Plaintiff John Voe a commission as an officer serving as a Second Lieutenant and contracting officer in the Air Force based solely on his HIV status.

127.    Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than was described in *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

128.    Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

25

a.  People living with HIV have suffered through a unique history of misinformation, stigma and discrimination for decades, and continue to suffer such discrimination to this day.

b.  People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process.  A small minority of the overall population is currently living with HIV.  People living with HIV fear to disclose their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government.  For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments.  Even today, many people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

c.  Particularly in light of dramatic medical advances—the benefits of which have only recently been fully understood and documented—a person's HIV status bears no relation to that person's ability to contribute to society.

d.  Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status.  While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their status as a condition of equal treatment.

129.   Defendants' disparate treatment of Plaintiff and other individuals living with HIV deprives them of their right to equal dignity and stigmatizes them as second-class citizens in violation of equal protection guarantees.

130.     There is no longer a valid purpose for this disparate treatment, and neither is the classification at issue—HIV status—adequately tailored in service of any governmental interest. This disparate treatment is not even rationally related to a legitimate governmental interest, let alone is there an important or compelling governmental interest to which these policies are substantially related or narrowly tailored.  Thus, the enlistment ban and service restrictions cannot withstand any form of scrutiny and are invalid.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiff's discharge was arbitrary, capricious, an abuse of discretion, and not in accordance with law;

B.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiff's discharge was unconstitutional;

C.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiff commissioned as an officer in the Air Force;

D.  Vacate and set aside the discharge;

E.  Enter an injunction directing the Department of Defense to reinstate Plaintiff as a Second Lieutenant, or in the alternative, directing the Air Force to reinstate Plaintiff as a graduated cadet at the U.S. Air Force Academy;

F.  Enjoin the Air Force from using AFI 44-178 to bar or to disenroll from a commissioning program, or discharge from the service, any person diagnosed with HIV while on active duty, including U.S. Air Force Academy Cadets;

G.  Enjoin the Department of Defense from allowing or using DoDI 6485.01, or any service-specific regulation that derived from any version of DoDI 6485.01, to bar, to

27

disenroll from an officer program, or to discharge from the military, any service academy or officer training applicant or member diagnosed with HIV while on active duty;

H.  Issue an injunction directing that HIV-positive service members, including service academy cadets or midshipmen, not found medically fit for duty and not otherwise receiving a waiver or exception to policy, undergo DES processing in the same manner as those with any other illness or injury;

I.  Award Plaintiff reasonable costs and attorneys' fees;

J.  Award such further relief as this Court deems appropriate.

Dated: May 30, 2018

Respectfully submitted,

/s/ Peter E. Perkowski

Peter E. Perkowski (D.C. Bar # 1013980)
PeterP@outserve.org
OUTSERVE-SLDN, INC.
P.O. Box 65301
Washington, DC 20035-5301
T: 1-800-538-7418

Geoffrey P. Eaton** (D.C. Bar # 473927)
GEaton@winston.com
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
T: 1-202-282-5000
F: 1-202-282-5100

Scott A. Schoettes*
SSchoettes@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 W. Adams Street, Suite 2600
Chicago, IL 60603
T: 1-312-663-4413

Bryce A. Cooper*
BCooper@winston.com
Jason Z. Pesick*
JPesick@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
T: 1-312-558-5600

Anthony Pinggera
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
Tel: 1-213-382-7600

Barton F. Stichman (D.C. Bar # 218834)
Bart_Stichman@nvlsp.org
Rochelle Bobroff (D.C. Bar # 420892)
Rochelle@nvlsp.org
NATIONAL VETERANS LEGAL
SERVICES PROGRAM (NVLSP)
1600 K Street, NW, Suite 500
Washington, DC 20006
T: 1-202-265-8305

*Attorneys for Plaintiff*

* *Pro hac vice* application forthcoming
** Application for admission or renewal filed with the clerk of this Court